UNITED STATES DISTRICT COURT

Northern District of California

SAN FRANCISCO DIVISION

| | |
|---|---|
| BRYAN K. MAYFIELD,<br><br>          Plaintiff,<br>     v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of<br>Social Security Administration,<br><br>          Defendant.<br>_____/ | No. 3:14-cv-03596-LB<br><br>**ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>**[ECF Nos. 14 & 18 ]** |

**INTRODUCTION**

Plaintiff Brian Mayfield moves for summary judgment, seeking judicial review of a final decision by the Commissioner of Social Security Administration, denying Mr. Mayfield Social Security Income ("SSI") disability benefits for his claimed disability of mental illness and injury to his right knee and left arm. (Administrative Record ("AR") 44). The Administrative Law Judge ("ALJ") found that Mr. Mayfield had two severe impairments but declared him not disabled and denied SSI disability benefits. (AR at 109.)

Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument. All parties have consented to the court's jurisdiction. (ECF Nos. 5 & 7.) For the reasons stated below, the court **DENIES** Mr. Mayfield's motion for summary judgment and **GRANTS** the Commissioner's cross-motion for summary judgment.

**STATEMENT**

Mr. Mayfield, now 48, applied for disability benefits on July 15, 2011. (AR at 185.) He alleged that he had been disabled since March 1, 2011 as a result of mental illness and injury to his right knee and left arm. (AR at 44.) The Commissioner denied his application both initially and upon reconsideration. (AR at 119, 126.) On July 20, 2012, Mr. Mayfield timely requested a hearing before an ALJ. (AR at 133.)

ALJ Mark Greenberg conducted a hearing on February 4, 2013 in Moreno Valley, California. (AR at 20.) Mr. Mayfied was represented at the hearing by Ms. Angenette Saltsman, a non-attorney representative. (AR at 96.)

The ALJ issued an order on February 26, 2013 denying benefits. (AR at 96.) The ALJ found that Mr. Mayfield had two severe impairments: attention deficit hyperactivity disorder ("ADHD") and a learning disorder. (AR at 98.) Nonetheless, the ALJ found that Mr. Mayfield had not been under a disability at any time from March 1, 2011, the alleged onset date, through February 26, 2013, the date of the opinion. (AR at 108.) The Appeals Council denied Mr. Mayfield's request for review on June 11, 2014, but did accept four evidentiary exhibits, including: (1) treatment notes from Mr. Mayfield's treating physician, Dr. Daniel Padua, dated December 15, 2012 through February 9, 2013; (2) a response letter from Dr. Gene Berg dated November 30, 2013; (3) a brief; and (4) correspondence. (AR at 1-6.) The Appeals Council ordered that these exhibits were to be made part of the Administrative Record. (AR at 6.)

On August 8, 2014, Mr. Mayfield filed the instant action, timely seeking judicial review of the final decision by Defendant Carolyn Colvin, the Acting Commissioner of Social Security Administration, denying him SSI disability benefits. (Complaint, ECF No. 1.) The case originally was assigned to the Hon. Jeffrey White. However, once the parties consented to proceed before a magistrate judge, the case was reassigned to this Court on August 27, 2014. (ECF No. 9.) By March 5, 2015, the parties' cross-motions for summary judgment were fully briefed and ripe for decision. ((Motion, ECF No. 14); (Opposition and Cross-Motion, ECF No. 18.)) Mr. Mayfield has not filed a Reply.

# LEGAL STANDARD

## I. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the plaintiff initiates the suit within 60 days of the decision. District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

## II. APPLICABLE LAW: FIVE STEPS TO DETERMINE DISABILITY

An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B).

The Social Security regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations,

UNITED STATES DISTRICT COURT
For the Northern District of California

then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's residual functional capacity, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's residual functional capacity, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., pt. 404, subpart P, app. 2. If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *See Tackett*, 180 F.3d at 1098.

## SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes (A) the medical evidence in the administrative record, (B) Ms. Nielsen's testimony, and (C) the ALJ's findings.

**I. MEDICAL EVIDENCE**

Mr. Mayfield, now 48, alleged that he was disabled as a result of mental illness and injury to his right knee and left arm. (AR at 44.)

**A. Dr. Padua: Treating Psychiatrist, Riverside County Mental Health**

Mr. Mayfield began seeing psychiatrist Daniel Padua at the Riverside County Department of Mental Health in September of 2011. (AR at 319.) Mr. Mayfield reported being unable to sleep and that he was hearing voices. (AR at 320.) He reported a history of drug abuse but also reported that he was currently in a court-imposed drug program. (AR at 319.)

Dr. Padua conducted a mental status examination, which revealed that Mr. Mayfield had fair insight and judgment and concrete interpretations of proverbs. (*Id.*) Dr. Padua diagnosed Mr. Mayfield with a Mood Disorder, not otherwise specified, and ADHD. (*Id.*)

Dr. Padua and Mr. Mayfield agreed that Mr. Mayfield should try taking Seroquel to address his "racing thoughts," sleep problems, and irritability. (*Id.*) Seroquel is indicated for treatment of

schizophrenia and for manic episodes of bipolar disorder, along with the associated depression.[1] Mr. Mayfield continued to see Dr. Padua on a monthly basis.

Mr. Mayfield saw Dr. Padua for a follow-up in October of 2011. (AR at 329.) At that time, he reported that his financial situation did not permit him to get his prescription filled or to get the requested laboratory tests done. (*Id.*) Mr. Mayfield was still having difficulty with sleep. (*Id.*) His mental status exam at that point showed a "constricted affect." (*Id.*)

By November of 2011, Mr. Mayfield was taking Seroquel as prescribed. He was still getting "moody" but reported that he was sleeping well. Dr. Padua increased his dosage of Seroquel.(AR at 328.) On December 2011 follow-up, Mr. Mayfield reported that with the new dosage of medication, he felt less "agitated." (AR at 327.)

When Mr. Mayfield saw Dr. Padua in February of 2012, Mr. Mayfield reported that he was "doing well," with no complaints of agitation, and that his sleep was improved. (AR at 326.) In March of 2012, Mr. Mayfield again reported that he was "doing good" but that if he failed to take his medication he would hear voices. (AR at 325.) His response to the medication, however, was positive. (*Id.*)

In April of 2012, Mr. Mayfield seemed to suffer a bit of a setback. He reported that he was "only ok" and that he sometimes had "mood swings." (AR at 324.) In May of 2012, he reported that he "still get[s] agitated" but that the medication helps. (AR at 323.) By June of 2012, he reported no current auditory hallucinations but that he had "racing thoughts" at least once a day. (*Id.*)These "racing thoughts" were preventing him from completing tasks. (AR at 368.) His mood was "up and down." (AR at 369.) A mental status examination showed no abnormalities. (*Id.*)

Mr. Mayfield did not return to Dr. Padua until October 6, 2012. (AR at 361.) At that time, Mr. Mayfield reported being in a depressed mood "every day"; that continued racing thoughts were interfering with his sleep; and that he was again hearing voices at night. (AR at 361, 363.) A mental status examination showed him to be alert, but distracted. (AR at 364.) He was diagnosed with Bipolar I Disorder, with moderate depression and with a current Global Assessment of Functioning

---

[1] *See* RxList, http://www.rxlist.com/seroquel-drug/indications-dosage.htm, RxList, Inc. (2015).

1  ("GAF") level of 65.[2] Dr. Padua continued Mr. Mayfield on the Seroquel but also added a drug
2  called Depakote. (AR at 362.) Depakote is indicated for treatment of the manic episodes of bipolar
3  disorder.[3]

4  On December 15, 2012, Mr. Mayfield reported to Dr. Padua that he continued to have mood
5  swings and auditory hallucinations, although they were somewhat "better." (AR at 358.) His mental
6  status examination again revealed evidence of hallucinations and distractedness, with a depressed
7  mood and a constricted affect. (*Id.*)

8  As part of his presentation to the Appeals Council, Mr. Mayfield included additional medical
9  evidence from Dr. Padua, including treatment notes that reflected that Mr. Mayfield returned to Dr.
10 Padua on February 9, 2013. (AR at 373-80.) Mr. Mayfield reported continued mood swings; that he
11 continued to isolate himself; that he was stressed due to his inability to provide for his family; that
12 he avoids closed places; and that he gets irritated by being around others. (AR at 376.) Mental status
13 examination again showed him to be distracted. (*Id.*) His Seroquel dosage was increased, and he was
14 continued on Depakote.(*Id.*)

15 **B**. **Dr. Gamboa – State Agency Examining Psychologist**

16 On August 31, 2011, the state agency sent Mr. Mayfield for examination and evaluation
17 by clinical psychologist Dr. Gabriela Gamboa. (AR at 306-11.) Dr. Gamboa's initial impressions
18 were that Mr. Mayfield was poorly groomed, that he had poor posture, and that he had difficulties
19 with his gait. (AR at 306.)

20 Dr. Gamboa conducted a mental status examination and found that Mr. Mayfield had somewhat
21 slow response times; that his speech was rapid and difficult to understand; that he had extremely low
22 to borderline intellectual function; that he had an agitated mood; and that he had a somewhat
23 nervous affect. (*Id.*) Dr. Gamboa also noted that Mr. Mayfield was experiencing some delusions of

---

[2] A GAF of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but that the person is generally functioning pretty well. Diagnostic and Statistical Manual of Mental Disorders, 32-35 (4th ed. American Psychiatric Association 1994).

[3] *See* RxList, http://www.rxlist.com/depakote-drug/indications-dosage.htm, RxList, Inc. (2015).

ORDER (No. 3:14-cv-03596-LB)
6

seeing people walk by. Finally, Dr. Gamboa reported that Mr. Mayfield had extremely low to borderline memory per test results; borderline attention and concentration; low-average to borderline insight and judgment; and an extremely low fund of general knowledge. (AR at 308-09.)

The standardized testing administered to Mr. Mayfield by Dr. Gamboa indicated that Mr. Mayfield had a full scale IQ of 63. (AR at 309-10.) Dr. Gamboa diagnosed Mr. Mayfield with a Learning Disorder, not otherwise specified; Polysubstance Abuse; and Speech Difficulties. She ruled out a Psychotic Disorder. (AR at 310-11.) Dr. Gamboa assessed Mr. Mayfield's GAF at 50. (AR at 311.) Dr. Gamboa found that Mr. Mayfield demonstrated the ability to understand, remember, and carry out short and simple instructions. However, Mr. Mayfield demonstrated only a "moderate inability" to understand, remember, and carry out detailed instructions; to make simple work-related decisions without special supervision; and to interact appropriately with supervisors, coworkers, and peers. (*Id.*) Dr. Gamboa noted that Mr. Mayfield would also require help managing any funds he might be awarded. (*Id.*)

**C. Dr. Berg – Examining Psychologist**

Counsel for Mr. Mayfied referred him to Dr. Gene Berg for a consultation and evaluation. Mr. Mayfield saw Dr. Berg on November 8, 2012. (AR at 338-41.) Dr. Berg observed that Mr. Mayfield was scattered and circumstantial in his discussions, and that he was easily distracted. Dr. Berg further found that Mr. Mayfield required "considerable focusing and redirection" during the interview. Dr. Berg described Mr. Mayfield's speech as "slightly pressured and excited." (*Id.*) He further noted that Mr. Mayfield had a tendency to twist and move about in his chair. (AR at 338-39.)

Dr. Berg reviewed Mr. Mayfield's treatment records from Riverside County Mental Health (AR at 340) and Dr. Berg also administered some tests to Mr. Mayfield. During the short term memory test, Mr. Mayfield was unable to recall any of the items on the test. Mr. Mayfield demonstrated an inability to complete calculations and he also demonstrated difficulty with tasks requiring sustained attention and concentration, as well as impulsivity and a lack of sophistication on hypothetical judgments.  Dr. Berg noted that Mr. Mayfield reported difficulty sleeping, that he had  limited energy, and that he had a history of hearing voices. (AR at 339.) Dr. Berg estimated Mr. Mayfield's intelligence to be in the low-average range. (*Id.*)

ORDER (No. 3:14-cv-03596-LB)
7

On the Beck Depression Inventory, Mr. Mayfield's score reflected a moderate degree of depression, including sleep problems, limited energy, and feelings of hopelessness. (AR at 338-39.) On the Patient Health Questionnaire, Mr. Mayfield's answers reflected anxiety, worry, restlessness, as well as a tendency to be easily annoyed. (AR at 338-40.)

Dr. Berg diagnosed Mr. Mayfield with a Mood Disorder, not otherwise specified, ADHD by history, and Polysubstance Dependence by history. Dr. Berg assessed his present GAF at 60. (AR at 340.)

In a Psychiatric/Psychological Impairment Questionnaire, Dr. Berg found that Mr. Mayfield would be "moderately limited" in eighteen out of twenty given areas of mental function. (AR at 346-48.) Dr. Berg added that he would be incapable of tolerating even a "low stress" work environment and that he would likely miss more than three workdays a month due to his symptoms. (AR at 349-50.)

## II. MR. MAYFIELD'S TESTIMONY

Mr. Mayfield appeared before ALJ Mark Greenberg on February 4, 2013. (AR at 20.) The ALJ opened the proceedings by confirming that Mr. Mayfield was being represented at the hearing by Ms. Saltsman, from the law firm of Binder & Binder. (AR at 22.) The following is a summary of the facts to which Mr. Mayfield testified at that hearing.

The ALJ began reviewing the record with Mr. Mayfield. Mr. Mayfield was 44 years old as of the alleged onset of his disability on March 1, 2011. (AR at 23, 185, 192.) As of September 30, 2012, the day he last met the insured requirements of the Social Security Act, Mr. Mayfield was 45 years old. Mr. Mayfield testified that he had graduated from high school but that some of his curriculum had consisted of special education classes. (AR at 23.) Mr. Mayfield stated that he had worked as a caretaker, a driver, a warehouse cleaner, a stacker, and a sandblaster. (AR at 24.)

Most recently, he had worked as a caretaker for his mother, who then moved away to take care of her own mother. (AR at 25.) Mr. Mayfield did offer, however, that his mother had believed that he "wasn't doing a very good job of taking care of her." (*Id.*)

The ALJ queried Mr. Mayfield about what appeared from his record to be a difficulty keeping jobs. Mr. Mayfield replied that he tends to "get irritated" and does not "like being around a lot of

people." (*Id.*) He also stated that he had difficulty accomplishing work tasks in the manner that was expected of him as he wanted to do things his own way rather than the way he had been asked to do them and that he did not like being "bossed around." (AR at 25.) Mr. Mayfield also stated that sometimes he would simply not show up to work, staying at home or sleeping, because he "just [did not] want to go to work or [he] didn't like [the] people he was working with." (AR at 26.) He also would try to work only half days, telling his employers he had something he had to go to because he would get irritated at work.

Mr. Mayfield testified that because he has difficulty staying focused, he regularly takes Seroquel and Depakote. (*Id.*) He used to use drugs and alcohol, and although he was sober at the time of the hearing, he admitted that he had relapsed with methamphetamine on Christmas of 2012. (AR at 31.) Previously, he had abstained from using drugs and alcohol since May 28, 2011. (AR at 31-32.)

Mr. Mayfield testified that he lived with his wife and their then 11-year-old son. (AR at 28-29.) They do not have a TV or a computer, but he reads the newspaper. (AR at 28.) He can usually follow "the big headline type, the titles of what's going on in the world," but he does not read the accompanying article. (*Id.*) He tries to help his son with his homework, but he cannot help his son with his reading because, as Mr. Mayfield explained, he does not read very well. (AR at 29.) Mr. Mayfield testified that he spends time with his dog, tries to watch a movie, and sleeps on the couch. (*Id.*)

Mr. Mayfield stated that he prefers to stay at home. (*Id.*) He does not drive, but he will take the bus to run errands, such as going to Walmart for dog food. (AR at 30.) Mr. Mayfied stated that he stays only as long as it takes to get the dog food, as he does not like being in "closed places." (*Id.*) Mr. Mayfield attends an outreach program on a weekly basis—the meetings last for an hour-and-a-half. He attends these meetings both to help him maintain his sobriety but also because the classes were ordered by Child Protective Services due to a domestic violence episode that resulted in his son's removal from the house for a year. (AR at 32, 34.) His son is now back in the house. (AR at 34.)

## III. VOCATIONAL EXPERT TESTIMONY

Vocational Expert ("VE") Dr. Luis Mas testified at the hearing. (AR at 36-42.) The VE classified

1  Mr. Mayfield's past relevant work as: (1) "home attendant," characterized under the Dictionary of
2  Occupational Titles ("DOT") as a medium exertion, semi-killed job (DOT # 354.377-014); (2)
3  maintenance laborer, a heavy exertion, unskilled job (DOT # 638.684-018); (3) driver, a medium
4  exertion, semi-skilled job (DOT # 905.683-014); and (4) thermostat assembly machine tender, a
5  light exertion, semi-skilled job generally (DOT # 692.685-218), but medium exertion as Mr.
6  Mayfield actually performed it. (AR at 37-39.)

7  The ALJ then presented the VE a hypothetical of a worker who was limited to work that is
8  non-public, unskilled, consisting of simple repetitive tasks, with minimal interaction with
9  co-workers or supervisors, with no requirements of a fast pace, and that exists in a "habituated
10 setting." The ALJ first asked the VE whether any of Mr. Mayfield's past work would be available
11 under that hypothetical. (AR at 39-40.) Before he answered the ALJ's hypothetical, the VE first
12 clarified with Mr. Mayfield some of the aspects of his earlier maintenance position. After that
13 discussion, the VE opined that none of Mr. Mayfield's past relevant work would meet that
14 hypothetical.

15 The VE then went on to testify that alternative jobs responsive to the hypothetical would include
16 airport maintenance person (DOT # 899.687-014); auto body repairman (DOT # 807.687-010); and
17 automotive electrician helper (DOT # 875.684-010), all of which were medium exertion, unskilled
18 jobs. (AR 40-41.) The VE testified also about the availability of those positions in the relevant area.
19 (*Id.*)

20 The ALJ then posited a second hypothetical in which the individual would be unable to work in
21 proximity to others, and would miss more than three workdays a month. Based on that hypothetical,
22 the VE testified that this person would not be employable. (AR at 41.) The VE further testified that d
23 someone who is occasionally unable to make even simple work-related decisions without special
24 supervision would also not be employable. (AR at 42.)

25 **IV.  ADMINISTRATIVE FINDINGS**

26 The ALJ found that Mr. Mayfield last met the insured status requirements of the Social Security
27 Act on September 30, 2012. (AR at 98.)

28 At step one of the evaluation process, the ALJ found that Mr. Mayfield had not engaged in

1  substantial gainful activity since the alleged onset of his disability on March 1, 2011. (*Id.*)

2  At step two, the ALJ found that Mr. Mayfield suffers from the severe physical impairments of
3  ADHD and a learning disorder, but that neither of those conditions meets or equals the criteria of a
4  Listing. (AR at 98-101.)

5  At step three, the ALJ found that Mr. Mayfield retains the capacity to perform work
6  at all exertional levels, but which is non-public in nature; involves no more than simple,
7  repetitive tasks; involves no more than minimal interaction with co-workers and supervisors; is
8  not fast-paced; and is performed "in a habituated setting." (AR at 101.) In so finding, the ALJ
9  granted "great weight" to the opinions of examining psychologist Dr. Gamboa and granted "little
10 weight" to those of examining psychologist Dr. Berg. (AR at 105-06.) The ALJ also found not
11 credible Mr. Mayfield's subjective complaints of greater limitations. (AR at 102-03.)

12 At step four, the ALJ found that Mr. Mayfield could perform his past relevant work as
13 maintenance laborer.

14 At step five, the ALJ additionally found that Mr. Mayfield could perform the alternative jobs of
15 airport maintenance person, auto body repairman, and automotive electrician helper, and that he
16 is, therefore, not disabled. (AR at 107-08.)

17 Overall, the ALJ found that Mr. Mayfield's mental impairments allow him to perform work that
18 is unskilled, with minimal interaction with coworkers and supervisors, and that is not fast-paced.
19 This finding means that Mr. Mayfield could continue in his past relevant work in maintenance, as
20 well as in alternative jobs in airport maintenance, auto body repair, and as an automotive electrician
21 helper, and that he is therefore not disabled. (AR at 96-109.)

## ANALYSIS

### I. DID THE ALJ PROPERLY EVALUATE THE MEDICAL EVIDENCE?

In fashioning Mr. Mayfield's Residual Functional Capacity ("RFC"), the ALJ found that Mr. Mayfield's ADHD and learning disorder limited him to work that is simple and repetitive, without exposure to the public, with only minimal interaction with co-workers and supervisors, that is not fast-paced, and that is performed "in a habituated setting." A claimant's RFC considers the record as a whole and is an administrative finding left to the Commissioner, not a medical finding. *See* 20

C.F.R. § 404.1546; *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) ("[i]t is clear that it is the responsibility of the [ALJ] ... to determine [RFC]."). The RFC finding is not required to match exactly the findings of any particular medical source. *See Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 2012) (when weighing a medical opinion, ALJ need not agree with everything in that opinion and may consider some portions less significant when evaluated against the other evidence of record).

In reaching his RFC determination, the ALJ noted that he gave great weight to the opinion of consultative examining psychologist Dr. Gamboa, and less weight to the opinion of Mr. Mayfield's examining psychologist Dr. Berg. (AR at 104-06.) Mr. Mayfield argues that it was improper for the ALJ to reject Dr. Berg's opinions about Mr. Mayfield's level of mental functioning. Mr. Mayfield argues that the ALJ should have adopted the more restrictive assessment of Dr. Berg that Mr. Mayfield "could not sustain full time employment." (AR at 106.) Mr. Mayfield also argues that the ALJ improperly disregarded significant aspects of Dr. Gamboa's opinion as well.

**A. Was it Permissible for the ALJ to Give Little Weight to Dr. Berg's Opinion?**

The ALJ rejected Dr. Berg's opinion for several reasons. First, the ALJ found that Dr. Berg's opinion that Mr. Mayfield could not sustain employment due to inadequate mental functioning was inconsistent with the medical records, specifically Mr. Mayfield's "longitudinal clinical presentation . . . and objective evidence." (*Id.*)

Mr. Mayfield argues that the ALJ should not have rejected the opinion of Dr. Berg because an ALJ may only reject the uncontradicted opinion of a treating physician for "clear and convincing" reasons supported by substantial evidence in the record. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted). The court finds, however, that as it relates to Dr. Berg, this standard is not relevant as he was not a treating physician. Dr. Berg was hired by counsel for the Mr. Mayfield to examine Mr. Mayfield and to make a consultative recommendation.

Mr. Mayfield next argues that the opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician. *See Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984). Again, citation to this standard is not

relevant as both Dr. Berg, on whom the ALJ relied minimally and Dr. Gamboa, on whom the ALJ relied greatly, were both examining physicians.

The ALJ rejected Dr. Berg's opinion that Mr. Mayfield could not sustain employment as internally inconsistent with Dr. Berg's assessment that Mr. Mayfield had various moderate limitations in mental work functions. (AR at 106, 346-48.) A claimant is not disabled simply because he has multiple mental limitations. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008).

The ALJ also rejected Dr. Berg's assessment. The ALJ found that Mr. Mayfield's activities of daily living were inconsistent with Dr. Berg's opinion. (AR at 106). *See* 20 C.F.R. § 404.1529(c)(3)(i) (ALJ may consider daily activities); *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995) (ALJ can reject medical opinion that is "in conflict with testimony from the claimant himself"). The ALJ cited the following evidence of Mr. Mayfield's activities as inconsistent with Dr. Berg's assessment: Mr. Mayfield (1) could prepare meals; (2) get his son ready for school; (3) help his son with basic homework; (4) use public transportation; (5) shop in stores; (6) attend weekly meetings for an outreach program for domestic violence with five to 15 people; (7) watch television; (8) play games; and (9) perform personal grooming. (AR at 109.) The ALJ found that Mr. Mayfield's participation in these activities was inconsistent with Dr. Berg's opinion that Mr. Mayfield could not work because of difficulty concentrating. (AR at 341.) *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).

Mr. Mayfield argues that it was improper for the ALJ to give less weight to Dr. Berg's opinion because Dr. Berg had been hired not to treat Mr. Mayfield but to generate evidence in support of his application for disability benefits. (AR at 105.) The ALJ did not, on this basis, reject Dr. Berg's opinion out of hand. In fact, the ALJ noted that this type of "evidence is certainly legitimate" but that "the context in which it was produced cannot be entirely ignored." (*Id.*) The court finds that the ALJ did not act improperly in considering the impetus for Mr. Mayfield's consultation with Dr. Berg as one factor among several he considered. *See Reddick*, 157 F.3d at 726 (noting that an ALJ may consider that an opinion was solicited on behalf of a claimant when the opinion is contradicted by the medical evidence); *Saelee v. Chater*, 94 F.3d 520, 523 (9th Cir. 1996) (same).

**B.  Was It Permissible for the ALJ to Give Greater Weight to Dr. Gamboa's Assessment?**

As both Dr. Gamboa and Dr. Berg examined Mr. Mayfied and assessed his residual mental function, to the extent that there are conflicts in the medical opinion evidence, it is solely the province of the ALJ to resolve those conflicts. 20 C.F.R. § 404.15272; *see Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). The question is whether the ALJ's interpretation of the evidence as a whole was reasonable. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). If the evidence in AR supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (consultative examiner's opinion "constitutes substantial evidence, because it rests on his own independent examination"); *see also Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

The ALJ relied more heavily on Dr. Gamboa's opinion because he found Dr. Gamboa's opinion more consistent with the clinical findings. (AR at 104-05.) Specifically, Mr. Mayfield had mild symptoms in September 2011. (AR at 104, 318.) Mr. Mayfield's mental status examinations were normal or grossly normal in October, November, and December 2011 and in February, March, April, May, June, and July 2012. (AR at 104, 323-29, 366, 369.) While Mr. Mayfield reported symptoms during that time period, overall, he was doing adequately well. (AR at 104, 324, [ok], 328 [doing well], 371 [having a good day].) The ALJ also placed greater reliance on Dr. Gamboa's opinion because it was consistent with the treating physician's reports in that it reflected that Mr. Mayfield's condition improved with medication. (AR at 104-05, 323-26, 371.)

Finally, the ALJ also gave greater weight to Dr. Gamboa's assessment because it was more consistent with the opinions of the three State agency non-examining physicians. (AR at 106.) (Psychiatrist B.A. Smith, M.D., in agreement with Dr. Gamboa that Mr. Mayfield could perform unskilled, non-detailed tasks in a non-public setting); (AR at 59, 74, 88, 106) (Psychiatrists Dr. Ying,, and Dr. Johnson agree that Mr. Mayfield could work with limitations). The consistency of these opinions constitutes substantial evidence in support of the ALJ's findings. *See* 20 C.F.R. § 404.1527(d)(2)(i); *Saelee*, 94 F.3d at 522.

ORDER (No. 3:14-cv-03596-LB)
14

### C. Was it Permissible for the ALJ to Not Adopt Each Aspect of Dr. Gamboa's Assessment?

Mr. Mayfield contends that the ALJ erred by not adopting the entirety of Dr. Gamboa's opinion after finding the opinion was entitled to great weight. Specifically, Mr. Mayfield contends that the ALJ erred by not adopting Dr. Gamboa's opinion that Mr. Mayfield had moderate limitations in his ability to make simplistic work-related decisions without special supervision. (AR at 311; Motion at 11:13-14.) The Commisioner counters that the ALJ was not required to adopt all parts of the opinion simply because he adopted some portion of it. *See Magallanes*, 881 F.2d at 753 (ALJ need not agree with each aspect of a physician's opinion in order for it to constitute substantial evidence).

Moreover, the ALJ's RFC does incorporate Dr. Gamboa's findings that Mr. Mayfield could understand, remember, and carry out short and simplistic instructions. (AR at 311.) On that basis, the ALJ concluded that Mr. Mayfield retained the RFC to perform unskilled work involving simple, repetitive tasks containing no more than three steps and work in a habituated setting. (AR at 101.) The court finds that the ALJ's adoption of portions of Dr. Gamboa's opinion was reasonable and must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (noting that even if the medical evidence were "susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld"). None of the three State agency non-examining physicians opined that Mr. Mayfield needed supervision to perform simple work. (AR at 48, 59, 74, 88, 101-06.) Also, neither the treatment evidence nor Mr. Mayfield's admitted activities support this additional limitation.

### II. DID THE ALJ PROPERLY EVALUATE MR. MAYFIELD'S CREDIBILITY?

Mr. Mayfield argues that the ALJ's findings that Mr. Mayfield's subjective complaints are not credible were unsupported by clear and convincing evidence. "An ALJ cannot be required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to [the Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability."); 20 C.F.R. § 404.1529(a) (an ALJ "will consider" all of a claimant's statements about symptoms, but "statements about your pain or other symptoms will

not alone establish that you are disabled").

To determine whether a claimant's testimony about subjective pain or symptoms is credible, the ALJ must engage in a two-step analysis. *See Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that reasonably could be expected to produce the alleged pain or other symptoms. *See Lingenfelter*, 504 F.3d at 1036. Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear, and convincing reasons for doing so. *See Lingenfelter*, 504 F.3d at 1036. When the ALJ finds a claimant's testimony not reliable, the ALJ must "specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan v. Commissioner of Soc. Sec. Admin*, 169 F.3d 595, 599 (9th Cir. 1999).

The exact level of deference due to the ALJ's decision is a matter of dispute between the parties. Until recently, this court would defer to the ALJ's credibility determination if it was supported by substantial evidence in the record. *See Thomas*, 278 F.3d at 959. Mr. Mayfield argues that in order to support the ALJ's credibility determination, it must be supported by clear and convincing evidence. The Commissioner recognizes that in two recent decisions, the Ninth Circuit reaffirmed that "clear and convincing reasons" are sometimes required to reject a claimant's testimony. *See Garrison v. Colvin*, 759 F.3d 995, 1015 n.18 (9th Cir. 2014); *Burrell v. Colvin*, --- F.3d ---, 2014 WL 7398892 at *2 (9th Cir. Dec. 31, 2014). The Commissioner distinguishes *Garrison* in that: (1) the legal standard was not central to the decision and *Garrison* summarily rejected the agency's argument without giving it reasoned consideration; and (2) the *Garrision* court held that the ALJ's decision "also would fail a far more forgiving inquiry." *See Garrison*, 759 F.3d at 1018.

In *Burrell,* the Ninth Circuit rejected the Commissioner's argument that ALJs are not required to provide "clear and convincing reasons" for finding the plaintiff not credible. *Burrell*, 2014 WL 7398892, at *2. The Commissioner argues that despite *Burrell*, the Commissioner still contends that the "clear and convincing" standard is contrary to 42 U.S.C. section 405(g) and does not give proper deference to the standard specified by the agency in SSR 96-7p (requiring "sufficiently specific

[reasons] to make clear . . . the weight the adjudicator gave to the individual's statements and the reasons for that weight").

The ALJ identified several reasons for finding Mr. Mayfield's testimony not credible. Mr. Mayfield complains that the ALJ discounted Mr. Mayfield's credibility due to his self-reported ability to perform daily activities like personal grooming activities, preparing simple meals, caring for his pet dog, using public transportation, and occasionally shopping." Mr. Mayfield argues that "none of those activities evince mental function of the kind, degree, duration, or frequency that would even marginally relate to the ability to sustain work-related tasks over an eight-hour day, five days a week, on a sustained basis." As discussed above, Mr. Mayfield's alleged disability falls into two areas – physical impairments due to alleged injury to his right knee and left arm, and disability related to mental illness. The ALJ's credibility findings above primarily relate to the ALJ's discussion of Mr. Mayfield's alleged physical injuries. Mr. Mayfield has not appealed the ALJ's findings that Mr. Mayfield's physical condition was not disabling.[4] Because Mr. Mayfield's physical abilities are not at issue here, the court need only review the ALJ's credibility determinations as they relate directly to Mr. Mayfield's alleged mental disability.[5]

Mr. Mayfield, in his application for disability benefits, has alleged a number of limitations arising from his purported mental disability. Mr. Mayfield has said that he required assistance communicating with others. The ALJ rejected this contention, finding that there was testimony in the record that Mr. Mayfield spent his time "playing sports and playing games" and also that he spent time with friends and family three to four times a week. (AR at 102.) Mr. Mayfield also claimed "difficulty getting along with others and concentration problems that affected his ability to perform daily activities." (AR at 103.) In determining Mr. Mayfield's credibility in this regard, the ALJ

---

[4] The ALJ reviewed and discredited the physical limitations found in Mr. Mayfield's testimony and also on the "Adult Function Reports" and "Third Party Function Reports" that Mr. Mayfield submitted as part of his application for benefits. *See* (AR at 102-04); *see also* Exs. 3E (AR at 213-20), 4E (AR at 221-28), 8E (AR at 250-57) and 9E (AR at 258-65).

[5] Additionally, the ALJ rejected the testimony of Mr. Mayfield's wife and his roommate in the Third Party reports to the extent that these reports were inconsistent with the testimony of Mr. Mayfield himself, and also to the extent that the information in these reports was inconsistent with the medical evaluations.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  looked not only to the fact that Mr. Mayfield reported being able to engage in the daily activities
2  listed above but also to Mr. Mayfield's medical records. The ALJ first noted that there was no
3  evidence in the record that Mr. Mayfield had ever been hospitalized for psychiatric treatment. (*Id.*)
4  The ALJ further found that Mr. Mayfield's medical records revealed a level of mental health
5  treatment, which the ALJ characterized as "minimal."

6  The ALJ analyzed Mr. Mayfield's monthly scheduled mental status examinations at the Riverside
7  County Department of Mental Health for the period October 2011 through March 2012. (AR at
8  317-20, 356-72, 373-80.) The ALJ noted that at certain mental status examinations, Mr. Mayfield
9  indicated "moodiness" and "agitation." The ALJ also noted that in many exams, Mr. Mayfield
10 reported that he was doing "good." The ALJ noted that many of those examinations revealed findings
11 within normal limits and that Mr. Mayfield demonstrated normal orientation, full range affect, alert
12 cognition, and judgment and insight within normal limits. (AR at 103.)

13 Mr. Mayfield asserts that the ALJ should not have categorized Mr. Mayfield's monthly
14 psychiatric treatment as "minimal" treatment, because these appointments, in addition to the
15 prescription for Seroquel and Depakote, were the appropriate treatment of Mr. Mayfield's psychiatric
16 disorder.  Mr. Mayfield argues by referring to this level of treatment as "minimal," the ALJ
17 impermissibly substituted his own judgment for that of a medical professional. As support for that
18 position, Mr. Mayfield cites to *Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999). *Tackett* is
19 inapposite because in *Tackett*, the ALJ purported to render a medical judgment as to what treatment
20 should have been provided to the claimant and to substitute his own medical judgment for that of a
21 treating physician. *Tackett*, 180 F.3d at 1102.

22 An ALJ may properly consider the treatment evidence in the credibility analysis. *See* 20 C.F.R. §§
23 404.1529(a) (ALJ may consider diagnosis, medical history, and prescribed treatment in evaluating
24 credibility), (c)(3)(iv) (ALJ may consider effectiveness of medication); SSR 96-7p (credibility is
25 impacted by information from medical sources, including medical history and treatment).

26 Here, the ALJ was looking to the level of treatment prescribed by the physicians and noting that
27 there is no evidence of treatment of an emergent nature.  Furthermore, for most of his visits, Mr.
28 Mayfield indicates that he was managing, and that when he follows the prescribed medicine regimen,

ORDER (No. 3:14-cv-03596-LB)            18

he does fairly well. (AR at 323-326, 369, 371.) *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("[i]mpairments that can be controlled effectively with medication are not disabling. . ..."). Based on his review of the medical information, the ALJ found not credible any claims by Mr. Mayfield of greater mental disability than what is reported in his medical evaluations.

Mr. Mayfield then argues that the ALJ was "cherry-picking the most benign aspects of the treatment records while ignoring the positive clinical findings and symptoms." (Motion at 14:6-15:14.) Mr. Mayfield contends that the ALJ has ignored those instances where Mr. Mayfield reported significant ongoing symptoms in favor of focusing only on Mr. Mayfield's normal mental status examinations and reports of relative improvement. Mr. Mayfield argues that the law clearly proscribes what he refers to as selective acknowledgment of the medical record. *See, e.g.*, *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001) (ALJ may not selectively rely on some aspects of the treating records while ignoring other aspects suggestive of a more severe impairment). The court finds that the ALJ did not ignore negative findings; he did note Mr. Mayfield's reports that he was at times "moody" and "agitated." (AR at 103.)

Finally, Mr. Mayfield argues that the ALJ omitted discussion of Mr. Mayfield's condition after April of 2012. It is true that Mr. Mayfield reported agitation, mood swing,s and racing thoughts in May and June of 2012. (AR at 323, 368-69). While it would have been better for the ALJ to have cited to those records, the court finds that the medical findings during May and June of 2012 are not so significantly different than those actually relied upon by the ALJ in making his credibility determination.

Mr. Mayfield places great reliance on reports of his worsening condition in the October 2012 to February 2013 time frame, and, indeed, this does appear to be the case. Nonetheless, the ALJ did not have to consider these worsening symptoms because Mr. Mayfield had to establish disability on or before his "date last insured" of September 30, 2012 in order to be entitled to a period of disability and disability insurance benefits. *See Burch*, 400 F.3d at 679 (so holding); (AR at 96 (Mr. Mayfield had sufficient quarters of coverage to remain insured through September 30, 2012).).

The ALJ properly considered Mr. Mayfield's activities of daily living. In particular, the ALJ noted that Mr. Mayfield attended weekly meetings with 5 to 15 people and used public transportation

even though he alleged he could not work because he had difficulty interacting with people. (AR at 25-27, 32, 102, 106.) The ALJ also considered that Mr. Mayfield could perform personal grooming, prepare simple meals requiring attention for up to 20 minutes, and perform some household chores. (AR at 106.)

The ALJ also considered medical records, including the following: (1) Mr. Mayfield's course of treatment with medication; (2) Mr. Mayfield's decreased symptoms and self-reported improvement with medication; and (3) the on-balance positive clinical findings in the treatment records. (AR at 103, 106, 318, 323-29, 366, 369, 371-72.) This evidence undermined Mr. Mayfield's testimony that he could not work because he could not complete tasks. (AR at 27-28, 102.)

Finally, the ALJ considered that medical opinions from consultative examiner Dr. Gamboa and three State agency non-examining psychiatrists that contradicted Mr. Mayfield's report of disabling symptoms. (AR at 48, 59, 74, 88, 105-06.) *See Molina*, 674 F.3d at 1113 (ALJ supported credibility finding with opinion of State examining physician); *Saelee*, 94 F.3d at 522 (findings of non-examining physician may constitute substantial evidence).

The court finds that on the whole, the ALJ's credibility determination therefore is supported by the extremely deferential "substantial evidence" standard of review prescribed by Congress in 42 U.S.C. section 405(g) and is also supported by clear and convincing evidence.

## CONCLUSION

The court **DENIES** Mr. Mayfield's motion for summary judgment and **GRANTS** the Commissioner's cross-motion for summary judgment.

This disposes of ECF Nos. 14 & 18.

IT IS SO ORDERED.

Dated: June 12, 2015

LAUREL BEELER
United States Magistrate Judge